Melinda S. McCorkle #6-3905
Stephen H. Kline #5-1761
Kline, McCorkle & Pilger
P.O. Box 1938
Cheyenne, WY 82003-1938
Tel: (307) 778-7056
Melinda@kmplaw.net
Steve@kmplaw.net
*Attorneys for Defendant Patricia E. Lane*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ROBERT M. LANE, ) | |
| ) | Civil Action No. |
| Plaintiff, ) | 15CV00155 – NDF |
| v. ) | |
| ) | |
| LUCAS E. BUCKLEY, et al., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT PATRICIA E. LANE'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Patricia E. Lane, by and through her attorneys, Stephen H. Kline and Melinda S. McCorkle of Kline, McCorkle & Pilger, hereby submits the following Memorandum of Law in support of her Motion for Summary Judgment:

**I.    INTRODUCTION**

From August 2012 to October 2012, Plaintiff transferred $2,029,682.42 to Ms. Lane's bank account pursuant to a Loan Agreement he created and asked Ms. Lane to sign. Plaintiff now seeks repayment of the Loan, which by its terms, does not require payment until 2040.

On February 25, 2015, Plaintiff filed his initial Complaint in the Superior Court of Arizona against numerous Defendants followed by his First Amended Complaint ("FAC") on May 11, 2015, which was later removed to this Court. The FAC alleged nine causes of actions. (ECF No. 1-1). Over the past two years, parties and claims have slowly but surely been dismissed. *See* ECF Nos. 57, 66, 108, 120, 130, 138. The only remaining parties are Patricia E.

Lane ("Ms. Lane") and DFWU[1]. The only remaining claims are Count VII (Rescission and Restitution), Count VIII (Fraudulent Transfer), and Count IX (Breach of Contract Enforced by Third Party Beneficiary), all of which relate to the above-referenced Loan.

## II.    BACKGROUND

This case stems from Plaintiff's voluntary petition for bankruptcy ("Bankruptcy Petition") filed on April 19, 2011. *See In re Robert M. Lane, Debtor,* United States Bankruptcy Court, District of Wyoming, Case No. 11-20398. The underlying facts preceding the bankruptcy and the bankruptcy itself are relevant to the present claims and are detailed below.

The Penobscot Enterprises Defined Benefit Pension Trust ("Pension Plan") was formed on January 1, 2002. (Ex. 1, p. 15). A month later, Penobscot Enterprises, Inc. was formed; Plaintiff was the President and Vice-President. (Ex. 2; Ex. 3, Resp.to Interrog. No. 7). Plaintiff also claims to have a self-directed individual retirement account ("IRA"). (ECF No. 1-1, at ¶ 23).

In January 2006, Plaintiff began a contentious divorce with his wife, Vikki Lane, which ended in a Judgment of Divorce in March 2009. Mr. Lane was ordered to pay $250,000 to Vikki Lane, as well as child support of $6,000 per month. (Ex. 4, pp. 32-40). In an attempt to collect child support, on November 16, 2009, Vikki Lane filed a motion to obtain a Qualified Domestic Relations Order ("QDRO") to be distributed from Plaintiff's Pension Plan. (Ex. 5).

Four days after Vikki Lane sought to obtain Plaintiff's retirement funds, DFWU, LLC ("DFWU") was created as a Delaware limited liability company. (ECF No. 133, p. 2; Ex. 6). On April 12, 2010, an account was opened for DFWU at the Bank of Jackson Hole. (Ex. 7). Plaintiff directed the purchase and sale of shares of the monies within DFWU. Although Plaintiff often directed the purchase by asserting the "manager" had advised him of a transfer

[1] Plaintiff asserts he can represent the interests of DFWU. (ECF No. 1-1, ¶ 23). Plaintiff accepted service on behalf of DFWU. (ECF No. 1-2, p. 8)

2

and including the financial institution on the email directing the transfer, subsequent requests for clarification of the transfer by the financial institution were directed to Plaintiff, with Plaintiff responding directly to the request. (Ex. 8). Plaintiff was the only individual with access to its safe deposit box containing gold and silver. (Ex. 9; Ex. 10 at 27:4-13 and 91:9-92:13). Plaintiff determined the individuals placed in management positions, first listing his mother and sister[2] (Ex. 11 at 31:10-36:6), later identifying Timothy Lane (Ex. 3, Resp. to Interrog. No. 11; Ex. 13; Ex. 36), then identifying his son, Charles Lane in 2013 (Ex. 14), and at some point, himself, when he accepted service on behalf of DFWU as the manager of DFWU[3]. (ECF No. 1-2, p.8).

Throughout this time period, UCC Financing Statements were filed in Wyoming (January 27, 2009), California (February 2, 2009), and Michigan (December 11, 2009) identifying all of Plaintiff's assets, including retirement funds, as sources of collateral, i.e., indicating Plaintiff's assets were subject to a lien. (Ex. 15). On August 9, 2009, the California UCC Financing Statement was amended to specifically identify Plaintiff's Penobscot Pension and IRA. (Ex. 16; Ex. 17, pp. 7-8). In responses to interrogatories, pleadings, and an affidavit to various courts, Plaintiff acknowledged he secured his IRA and Pension Plan, thus causing liens to be filed against his retirement assets. (Ex. 18, p. 5; Ex. 19, pp. 12-13; Ex. 20, pp. 11-12)

On May 3, 2010, Plaintiff directed Brian Jones at the Bank of Jackson Hole to transfer "all securities and all but $250 cash in my IRA account at the Bank of Jackson Hole to the DFWU, LLC account." (Ex. 21). Plaintiff signed paperwork stating he understood certain transactions are prohibited for tax-exempt retirement accounts under the Internal Revenue Code and that he and any other "disqualified person" are prohibited from purchasing or selling

---

[2] Patricia A. Lane is Plaintiff's mother. Patricia E. Lane is Plaintiff's sister.
[3] Plaintiff and his son, Charles Lane, are noticeably absent from Plaintiff's response to an interrogatory asking Plaintiff to identify, among other things, all managers of DFWU. (Ex. 3, Resp. to Interrog. No. 11).

property to a disqualified person. (Ex. 22, p. 3). Plaintiff further acknowledged that he had "sole responsibility for directing the investment of my account". (Ex. 22, p. 3).

On May 11, 2010, the California Divorce Court issued its order granting Vikki Lane's motion for a QDRO requiring that the Penobscot Pension distributions due to Plaintiff be paid instead to Vikki Lane to satisfy his child support obligation. (Ex. 5). On May 13, 2010, Plaintiff directed his brother, Timothy Lane, the supposed trustee of the Pension Plan, to transfer all but $1.00 of its assets to DFWU. (Ex. 23; Ex. 44 at 77:10-78:11).

On October 4, 2010, Plaintiff requested a distribution from his IRA in order to satisfy the California Court order requiring payment of child support. (Ex. 24). The same day, Brian Jones sent a letter to Plaintiff stating he could not honor his request because a lien had been filed against the IRA and because the assets of the IRA were invested in an illiquid investment without a formal valuation. (Ex. 25). Mr. Jones also submitted an affidavit stating the same, which oddly was dated two months earlier (August 3, 2010) and misspelled Mr. Jones' first name. (Ex. 26). Mr. Jones later testified that Plaintiff had drafted this letter and Declaration for him, which he then signed. (Ex. 27 at 25:23-32:15)[4].

At some point, a Loan Agreement ("Loan or Loan Agreement") between DFWU and Ms. Lane was created. (Ex. 11 at 45:21-46:13; Ex. 28). The Loan Agreement is dated June 23, 2010; however, when it was executed is unclear. Ms. Lane testified the Agreement was signed in 2012; Mr. Lane testified he was unsure when the Loan was signed; the Agreement itself does not identify the date of the signature. (Ex. 11 at 39:16-40:6; 45:21-48:19; 51:19-52:15; 57:5-21; 158:19-159:12; Ex. 28; Ex. 29 at 84:11-86:9). Repayment of the Loan is due on June 23, 2040. (Ex. 28). The Loan states no payments are required before June 23, 2040, there is no basis for

---

[4] Ms. Lane is not in possession, nor does she have access to, the e-transcript of Brian Jones' deposition. Ms. Lane also does not have access to the e-transcripts of Patricia E. Lane, Roger Wilde or 1/17/14 Bankruptcy transcript.

accelerating the loan, the Borrower (Ms. Lane) is not obligated to make payments on demand to the Lender (DFWU), and the Borrower's sole payment obligation is to repay the Loan on or by June 23, 2040. (Ex. 28). Finally, the Loan states if a legal dispute is brought, "[t]he party bringing the dispute shall pay all parties' legal fees." (Ex. 28).

Whether the Loan contained monies that should be excluded from the Bankruptcy became a source of contention. The Bankruptcy Trustee argued monies transferred to Ms. Lane during the pendency of the bankruptcy belonged to the bankruptcy estate. (Ex. 30, p. 3). Plaintiff argued they were not part of the estate, and in support, repeatedly attested to the validity of the Loan. In 2013, Plaintiff submitted an Affidavit to the Bankruptcy Court stating "I witnessed this loan agreement being signed and attest to its validity." (Ex. 31, p. 2). In 2014, Plaintiff testified before the Bankruptcy Court that he was present at the signing of the Loan. (Ex. 29, pp. 84-85). On October 23, 2012, Plaintiff sent an email to several individuals stating as follows:

> DFWU is not an estate asset. It is a Canadian domiciled company[5]. The IRA and pension own units in DFWU, but not the underlying assets. The DFWU Operating Agreement permits loans to members and a loan was made to Patricia Lane in full compliance with the Operating Agreement. There is no restriction on DFWU activities as part of the PI stipulation and this loan is perfectly legal. The loan remains an asset of DFWU and guarantees the unitholders a positive return. The loan agreement was entered into quite a while ago.

(Ex. 32). Plaintiff hired an expert in the Bankruptcy case to testify that the Loan was valid and the valuation of DFWU should be decreased due to the unlikelihood of repayment. (Ex. 33, pp.5-6; Ex. 34 at 43:7-48:23; 67:20-69:3). Plaintiff repeatedly told the Bank of Jackson Hole that money deposited into Ms. Lane's bank account was a loan. (Ex. 14; Ex. 35).

On August 23, 2012, Plaintiff began directing the transfer of funds from DFWU to Ms. Lane's personal bank account. From August 23, 2012 to October 30, 2012, Plaintiff directed a

---

[5] Contrast this statement to numerous assertions that DFWU is a Delaware Corporation. *See* ECF No. 1-1, ¶ 23; Ex. 35, p. 2.

total of $2,029,682.00 be transferred to Ms. Lane's bank account. (Ex. 36). After these funds were transferred to Ms. Lane's bank account, the Bankruptcy Trustee sought to retrieve these funds from Ms. Lane and commenced an Adversary Proceeding No. 12-02013 on December 19, 2012 against Ms. Lane and DFWU (as well as other entities and individuals) contending that the assets now held by Ms. Lane were part of the Bankruptcy Estate. (Ex. 37). Ms. Lane, individually and on behalf of DFWU, entered into a Settlement Agreement with the Trustee on February 25, 2013[6]. (Ex. 38). Plaintiff then switched streams, arguing that the money lent to Ms. Lane were retirement assets, and could only be given to a third-party consistent with the pension, IRA and DFWU Operating agreement and "applicable" law. (*See generally* ECF No. 1-1 and Ex. 40). Nonetheless, Plaintiff continued to assert to the Bank of Jackson Hole that the Loan was an "asset" of DFWU and continued to assert that the money deposited into Ms. Lane's bank account was a loan which was allowed under the DFWU Operating Agreement. (Ex. 35). Mr. Lane continued to assert, under oath, that the Loan was "valid". (Ex. 31). As late as April 22, 2015, in a strikingly similar lawsuit against a number of parties, including Vikki Lane and Vikki Lane's attorney, Plaintiff again asserted the proceeds of the Loan between DFWU and Ms. Lane were not his property. (Ex. 41, p. 17 ¶ 94)(stating "Dr. Lane is attempting to seize the proceeds of a loan made by DFWU, LLC to Patricia E. Lane falsely arguing that it is Robert's property."). On May 11, 2015, he filed his FAC in the present case alleging, among other things, that the Loan is void or voidable, and that he is the third-party beneficiary and equitable owner of the monies loaned to Ms. Lane. ECF No. 1-1, ¶¶ 115, 128-132.

On July 20, 2015, Plaintiff, as manager of DFWU, requested Ms. Lane to pay $2,915,312.42 within thirty (30) days. (Ex. 42). Ms. Lane has not refused to repay the Loan to

---

[6] Vikki Lane also filed a lawsuit against Ms. Lane because she had funds which Vikki Lane asserted were properly hers. Ms. Lane settled the matter with Vikki Lane on July 1, 2014. Ex. 39.

DFWU; rather, Ms. Lane has testified that she will not repay the Loan prior to its due date in 2040. (Ex. 11 at 52:16-53:7; 151:22-23; 190:6-20; Ex. 34 at 43:7-44:6).

On January 4, 2017, Plaintiff pled guilty to Bankruptcy Fraud. (Ex. 43). He is currently incarcerated.

### III.        STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The Penobscot Enterprises Defined Benefit Pension Trust ("Pension Plan") was formed on January 1, 2002. (Ex. 1, p. 15). Plaintiff also claims to have a self-directed individual retirement account ("IRA"). (ECF No. 1-1, at ¶ 23).

2. Plaintiff's retirement funds, including the Pension Plan and IRA, had liens placed on them. (Ex. 15; Ex. 16; Ex. 17, pp. 7-8; Ex. 18, p. 5; Ex. 19, pp. 12-13; Ex. 20, pp. 11-12).

3. DFWU, LLC ("DFWU") was created as a Delaware limited liability company on November 20, 2009. (ECF No. 133, p. 2 and Ex. 6). On April 12, 2010, an account was opened for DFWU at the Bank of Jackson Hole. (Ex. 7).

4. On May 3, 2010, Plaintiff directed Brian Jones at the Bank of Jackson Hole to transfer "all securities and all but $250 cash in my IRA account at the Bank of Jackson Hole to the DFWU, LLC account." (Ex. 21). Plaintiff signed paperwork stating certain transactions are prohibited for tax-exempt retirement accounts under the Internal Revenue Code. (Ex. 22).

5. On May 11, 2010, the California Divorce Court issued its order granting Vikki Lane's motion for a QDRO requiring that the Penobscot Pension distributions due to Plaintiff be paid instead to Vikki Lane to satisfy his child support obligation. (Ex. 5).

6. On May 13, 2010, Plaintiff emailed Timothy Lane thanking him for transferring all but $1.00 of its assets to DFWU. (Ex. 23). Timothy Lane was the trustee of the Penobscot Pension trust at the time the pension funds were transferred to DFWU, LLC. (Ex. 44 at 77:10-78:11).

7.  A Loan Agreement between DFWU and Ms. Lane was executed, but it is unclear when that occurred. (Ex. 11 at 39:16-40:6; 45:21-48:19; 51:19-52:15; 57:5-21, 158:19-159:12; Ex. 28; Ex. 29 at 84:11-86:9). Repayment of the Loan is due on June 23, 2040. (Ex. 28). There is no basis for accelerating the loan, no payments are required before June 23, 2040, and Ms. Lane is not obligated to make payments on demand. (Ex. 28). Ms. Lane's sole payment obligation is to repay the Loan on or by June 23, 2040. (Ex. 28). If a legal dispute is brought related to the Loan, "[t]he party bringing the dispute shall pay all parties' legal fees." (Ex. 28).

8.  Plaintiff was present when the Loan was executed and has repeatedly attested to the validity of the Loan. (Ex. 29, pp. 84-85; Ex. 31).  Plaintiff has repeatedly asserted that the Loan is an asset of DFWU and guarantees a positive return. (Ex. 32; Ex. 35).

9.  On August 23, 2012, Timothy Lane was the Manager of DFWU. (Ex. 13).

10. From August 23, 2012 to October 30, 2012, either Plaintiff or Timothy Lane as Manager of DFWU directed the transfer of $2,029,682.42 from the DFWU account to Ms. Lane's personal bank account.  (Ex. 36).  Plaintiff initiated every email related to transferring these funds.  *Id.*

11. Ms. Lane did not transfer money from DFWU, LLC to her own bank account. (Ex. 36).

12. Plaintiff requested early repayment of the Loan. (Ex. 42). Ms. Lane has stated she will not repay the Loan prior to its due date. (Ex. 11 at 52:16-53:7; 151:22-23; 190:6-20; Ex. 34 at 43:7-44:6).

13. Plaintiff committed bankruptcy fraud.  (Ex. 43).

## IV.    STANDARD OF REVIEW

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based upon "materials in the record, including depositions, documents . . . or other materials." Fed. R.

Civ. P. 56(a) and 56(c)(1)(A). Viewing the facts in the light most favorable to the non-moving party, the Court must determine whether the evidence could support a jury verdict for the non-moving party. *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997). Factual disputes about immaterial matters are irrelevant to a summary judgment determination. *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1361 (10th Cir. 1993).

To be entitled to summary judgment, the moving party is not required to negate the elements of the non-moving party's claims. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). "Once the movant has made a showing that there is no genuine issue of material fact, the non-moving party 'may not rest upon the mere allegations or denials of the pleadings,' but 'must set forth specific facts showing that there is a genuine issue for trial.'" *Hom v. Squire*, 81 F.3d 969, 973 (10th Cir. 1996) (citations omitted). To be a "genuine" factual dispute, there must be more than a mere scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Plaintiff must support the claim with more than conjecture and speculation. *Self v. Crum*, 439 F.3d 1227, 1236 (10th Cir. 2006). Summary judgment may be granted if the evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51. The court must disregard statements of mere belief. *See Tavery v. United States*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994) (*citing Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831 (1950)). "Unsupported conclusory allegations ... do not create an issue of fact." *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

"A court may take judicial notice of its own records as well of those of other courts, particularly in closely-related cases." *Hutchinson v. Hahn*, 402 F. App'x 391, 394–95 (10th Cir.

2010) (citing *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979)).   Ms. Lane requests the Court take judicial notice of the related bankruptcy proceedings and documents in *In re Robert M. Lane, Debtor,* United States Bankruptcy Court, District of Wyoming, Case No. 11-20398.

## V.    ARGUMENT

### A. Plaintiff is estopped from arguing the Loan is void, voidable, or otherwise invalid or worthless because this position is inconsistent with his position in other litigation.

At the heart of each remaining claim lies an undisputed fact which Plaintiff hopes to shield from the Court - that he was involved with the Loan and every single transfer of money which he now complains was done to defraud him. (Ex. 36).   Plaintiff has repeatedly testified that the Loan he now claims is void or voidable was a valid Loan, that he witnessed the execution of the Loan, and that the Loan is a valuable asset of DFWU. (Ex. 29, pp. 84-85; Ex. 31, p. 2; Ex. 32; Ex. 33, pp. 5-6; Ex. 34 at 43:7-44:6, 67:20-69:3; Ex. 35).   Ms. Lane has testified that Plaintiff, in fact, created the Loan; an assertion which the Bankruptcy Court found credible.  (Ex. 11 at 45:21-46:13; Ex. 45, pp. 6-7).  Plaintiff's course of conduct shows that he directed all of the transfers, including the two million dollars that was placed into Ms. Lane's account which is the subject of this lawsuit. (Ex. 36).

Plaintiff cannot repeatedly assert in one Court that a Loan is a valid asset and then dispute the validity and value of the Loan in another Court depending upon which assertion suits his purpose. As Judge Johnson noted in his Order imposing filing restrictions against Plaintiff:

> Litigants are barred from adopting views that are inconsistent with their previous positions in the same or related litigation. *United States v. 198.73 Acres Of Land, More Or Less*, 800 F.2d 434, 436 (4th Cir. 1986). Litigants cannot "play fast and loose" or "blow hot and cold" with the courts. *Ibid*; *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 460 (7th Cir. 1991). Furthermore:
>
>> "[T]he right of access to the courts is neither absolute nor unconditional, and there is no constitutional right of access to the

> courts to prosecute an action that is frivolous or malicious." *Tripati [v. Beaman]*, 878 F.2d at 353 (citation omitted) (emphasis added). Federal courts have "power under 28 U.S.C. § 1651(a) to enjoin litigants who abuse the court system by harassing their opponents." *Id.* at 352. Thus, federal courts may "regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances." *Id.* (quotation omitted). Although "[l]itigiousness alone will not support an injunction restricting filing activities," filing restrictions "are proper where a litigant's abusive and lengthy history is properly set forth," *id.* at 353, the court provides guidelines as to what the litigant "must do to obtain the court's permission to file an action," and the litigant receives "notice and an opportunity to oppose the court's order before it is instituted," *id.* at 354.

*Smith v. Krieger*, 389 Fed. Appx. 789, 2010 WL 2912186, **8 (10th Cir. 2010). "No one, rich or poor, is entitled to abuse the judicial process." *Tripati v. Beaman*, 878 F.2d at 353 (citations omitted).

*In Re Lane*, No. 15-CV-114-J, 2015 WL 12915111, at *1 (D. Wyo. Aug. 13, 2015), *aff'd sub nom. In re Lane*, 646 F. App'x 641 (10th Cir. 2016) (unpublished). Plaintiff cannot continuously assert conflicting positions to the courts depending upon which position suits his purpose.

Plaintiff continues this practice to this day. He was obviously present when he drafted the emails directing the transfer of his retirement assets to DFWU and then to Ms. Lane, so perhaps it should not be surprising that after filing this lawsuit directly related to the transfer of those funds, Plaintiff continues to attempt to mislead the Court into thinking the Loan was created by Ms. Lane to Ms. Lane and then Ms. Lane transferred funds to herself without his knowledge. Nonetheless, it is heinous that Plaintiff continues to attempt to mislead the Court by submitting documents which purportedly demonstrate Ms. Lane orchestrated the Loan and transferred these funds to herself while omitting the documents that actually show who directed the funds since all of those documents came from the very same subpoena to the Bank of Jackson Hole. (ECF No. 123, pp. 2-4; ECF No. 133, pp. 3-4; ECF No. 137, pp. 5-7).

Because Plaintiff's current view that the Loan is worthless and void, voidable, or otherwise invalid is inconsistent with his previous testimony, sworn statements, and pleadings in other courts, Plaintiff is estopped from now arguing that the Loan is void or voidable or did not provide reasonably equivalent value for the assets loaned. *United States v. 198.73 Acres Of Land, More Or Less*, 800 F.2d at 436. At a minimum, Counts VII and VIII should be dismissed because of Plaintiff's inconsistent positions.

**B.  Summary Judgment must be granted on Count VII of the FAC because Ms. Lane was not a fiduciary and did not breach a duty; because the claim is barred by the doctrines of collateral estoppel, res judicata and law of the case; and because Plaintiff's IRA and Pension Plan lost the protections of ERISA when he placed liens on the funds.**

Count VII asserts a cause of action for "rescission and restitution".  Rescission and restitution are not causes of action; they are equitable remedies which are only invoked if a breach of contract occurs or if a contract is void or voidable. *See* ECF No. 138, p. 7; Fed. R. Civ. P. Rule 8(a)(2); 17A Am. Jur. 2d Contracts § 561; *Fryer v. Campbell*, 43 P.2d 994, 996 (Wyo. 1935).  This Court, in its Order Granting Defendants Hathaway & Kunz, P.C., Scott W. Meier, CPA, and Lucas E. Buckley's Motion To Dismiss Counts VII and VIII with Prejudice, states that the cause of action in Count VII is actually a "breach of fiduciary duty". (ECF No. 138, p. 7).

The crux of Plaintiff's argument that Ms. Lane breached her fiduciary duty to Plaintiff stems from the inaccurate assertions and statements of law that Ms. Lane was managing Plaintiff's retirement funds when the Loan was entered into and the funds transferred.  Plaintiff asserts Ms. Lane was a "fiduciary of plan assets involving a loan of assets" of his IRA at the time that she entered into the Loan, and argues that entering into the Loan was a prohibited transaction by a disqualified person under the Internal Revenue Code, and therefore, the Loan is void or voidable. (ECF No. 1-1, ¶¶ 9, 80, 113-120).  This argument fails for three reasons.

First, it is undisputed that Plaintiff was present when the Loan was signed, has repeatedly testified to the validity of the Loan, and directed, or at a minimum, was involved with transferring all of the money at issue into Ms. Lane's bank account. It is unclear when the Loan Agreement was signed; the Loan is dated June 23, 2010, Ms. Lane testified that she signed the Loan in 2012, and Plaintiff has testified that he was present but cannot identify a date. (Ex. 11 at 39:16-40:6; 45:21-48:19; 51:19-52:15; 57:5-21, 158:19-159:12; Ex. 28; Ex. 29 at 84:11-86:9). Even if we accept June 23, 2010 as the date of the Loan, by that point, Timothy Lane was the trustee of the Pension Plan, and was directed to transfer the Pension Plan assets to DFWU. (Ex. 23; Ex. 44 at 77:10-78:11).). Plaintiff had already placed the funds in his IRA into DFWU by that point and had signed paperwork acknowledging he had "sole responsibility for directing the investment of my account" and which identified prohibited transactions. (Ex. 21; Ex. 22). By the time the DFWU funds were transferred to Ms. Lane's account (which, according to Ms. Lane, coincides with executing the Loan), Ms. Lane was not the manager of DFWU, which, according to Plaintiff, held all of his retirement assets. Accordingly, Ms. Lane was not a "fiduciary"[7] or otherwise in control of Plaintiff's retirement assets when the funds were transferred.

Second, Plaintiff previously made a similar argument to the Bankruptcy Court, which the Court ruled upon. To that end, the ruling by the Bankruptcy Court as it relates to the receipt of retirement assets by Ms. Lane should be given full effect and Plaintiff's claim under Count VII is barred by the doctrines of collateral estoppel, res judicata and the law of the case doctrine.

---

[7] The Internal Revenue Code defines "fiduciary" as: (A) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; (B) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (C) has any discretionary authority or discretionary responsibility in the administration of such plan. 26 U.S.C.A. § 4975.

This Court may recall that Plaintiff's bankruptcy was a lengthy affair. On February 25, 2013, the Trustee entered into a settlement agreement with Ms. Lane and DFWU[8]. (Ex. 38). On March 11, 2013, Plaintiff objected to the settlement on several grounds, including: (1) Ms. Lane could not turn over the money loaned to her by DFWU to satisfy creditors because those monies are retirement assets; (2) turning over the assets of the Pension Plan to the Bankruptcy Trustee violated ERISA and the Pension Plan agreement; and (3) the retirement assets were subject to several liens. (Ex. 17, pp. 7-10). Plaintiff abandoned these objections and instead entered into a Settlement Agreement with the Bankruptcy Trustee on June 20, 2013, in which he was allowed to retain 2.5 million dollars in retirement assets. (Ex. 46). The Trustee determined since Plaintiff had asserted the Loan monies were retirement assets, the right to the Loan proceeds, in conjunction with the artwork, satisfied the Trustee's obligation to set aside 2.5 million in retirement assets[9]. (Ex. 45). This led Plaintiff to hire Roger Wilde to discount the value of the Loan significantly, despite prior assertions that the Loan guaranteed a positive return. (Ex. 32; Ex. 33, pp. 5-6; Ex. 34 at 43:7-44:6; 67:20-69:3). After reviewing pleadings and hearing testimony on the above, the Bankruptcy Court held as follows:

> Debtor argues that the Trustee failed contribute assets into Debtor's retirement fund to insure its balance at the amount of $2.5 million dollars under the terms of the Debtor Settlement Agreement. Based on pleadings that the Trustee filed, Debtor asserts that the balance of the retirement accounts is a moving target. The court agrees. The balance of the retirement accounts was not clear to the court until now. **Its review of the pleadings, testimony and evidence reflect that the moving target is based largely upon the actions of the Debtor.**
>
> The retirement funds are assets of DFWU, LLC ("DFWU"). Debtor's sister, Patricia E. Lane ("Patricia") and mother, Patricia A. Lane ("Mother") each owned one share of the limited liability company with Debtor owning the balance. Patricia's testimony, through her deposition, reveals that DFWU was formed at Debtor's request after Debtor's divorce judgment was entered, but before he filed for bankruptcy protection. Mother was named as president and Patricia was the

---

[8] Other entities were included in this settlement agreement but are not relevant to this motion.
[9] Plaintiff elected to take artwork in the amount of $470,700.00 as part of the 2.5 million in retirement assets.

manager, although Patricia stated that she did not understand her role in DFWU. Patricia testified that Debtor controlled and transferred funds into DFWU's bank account at Bank of Jackson Hole, himself, or instructed her what to do regarding payments using the funds. A subsequent bank account was opened with Wells Fargo Bank under Patricia's and Mother's names with a deposit in the amount of $599,500.00. Additional deposits were made in the amounts of $106,000.00; $557,784.95 (Oct. 5, 2012); $369,397.47 (Oct. 12, 2012); and $397,000.00 (Nov. 6, 2012). Patricia testified that all the transactions were from DFWU funds, transferred by the Debtor and totaled "a little more than two million dollars."

Patricia testified that the she used the funds to purchase a vehicle for Debtor and pay the taxes for the transaction, pay Patricia's credit card expenses incurred by Debtor, and cash sent to the Debtor in increments of $1,000.00 to $3,000.00, based upon his requests.

During the time period between September to Christmas, 2012, Debtor presented to Patricia, the "Loan Agreement Between DFWU, LLC and Patricia E. Lane Dated June 23, 2010" for her signature. She was certain that she did not execute the document in June 2010, although the document has that date in its heading. The terms of the loan do not require Patricia to provide any security as collateral or make any payment on the loan until its maturity date of June 23, 2040.

On November 16, 2012, Patricia issued a check to J.R. Harlan, LLC in the amount of $1,800,000.00 upon the instructions of the Debtor and provided the check to him. Patricia had formed the J.R. Harlan, LLC entity in Pennsylvania with the assistance of an attorney, as instructed by Debtor. Debtor later presented the check to the bank in November 2013. However, the bank refused to honor the check. Patricia she did not know the reason for the long delay between the time that she issued the check and that the Debtor attempted to deposit it. However, during that time, Patricia transferred the funds from the account with her Mother, into a separate account under her name only. The funds are currently in Patricia's possession. **The court, in comparing dates, documents and events, finds Patricia's testimony to be credible.** Debtor's testimony regarding J.R. Harlan, LLC was evasive and unbelievable.

Debtor presented testimony and evidence of Roger E. Wilde, of ANACAPA Valuations, Inc. who testified regarding the value of Debtor's Pension Assets in the Penobscot Pension Trust. Mr. Wilde discounted the value of the Pension Assets based upon the unsecured, high-risk loan to Patricia of the 1.8 million dollars. **Although this testimony and evidence was accepted by the court, it does not find that discounting the value of the Pension Assets to be equitable, based upon Debtor's actions of nondisclosure and subterfuge.** The court will not discount the Pension Assets based upon this evidence.

The court's review of the history of the Pension Assets reflects that Debtor failed to properly disclose the value of his Pension Assets upon filing his bankruptcy petition and schedules, which had a value of $2,029,000.00 at the time the Debtor filed for bankruptcy protection. **Debtor, on his own or through directions to Patricia, transferred the funds for his benefit and use.** Thereafter, he produced the Loan Agreement transferring the balance of the Pension Assets to Patricia's personal control. The court finds that the value of the Pension Assets, for the purpose of the Debtor Settlement Agreement, was $2,029,682.42, leaving a balance of $470,317.58 owed to Debtor…..The bankruptcy estate does not owe any further amounts to Debtor regarding the 2.5 million dollars of Pension Assets. Debtor's Pension Assets and purchased artwork total over the 2.5 million dollars that Debtor was allowed to retain by the Debtor Settlement Agreement.

Ex. 45, pp. 5-8 (emphasis added).

As the Bankruptcy Court noted, Plaintiff had entered into a Settlement Agreement to resolve all pending litigation but "continues efforts to control the outcome of this bankruptcy case." (Ex. 45, pp. 3, 10). That continues to be the case here. The Bankruptcy Court already reviewed evidence and testimony related to the Loan, agreed the Loan was valid but the value of the assets therein should not be discounted, determined Ms. Lane's testimony was more credible than Plaintiff's, held Plaintiff had transferred the funds for his benefit and use, and held the Loan could be used to satisfy the 2.5 million dollars carved out of the bankruptcy as retirement assets. (Ex. 45). Plaintiff was well aware of the prohibitions against loaning funds to a disqualified person at the time this issue was litigated as he had signed an acknowledgment regarding the same in May 2010, and in fact, made ERISA-related arguments to the Bankruptcy Court in March 2013. (Ex. 17, p. 8; Ex. 22). Any argument that the Loan was void or voidable based upon the assertion that Ms. Lane was a fiduciary who breached that duty by entering into prohibited action either was or should have been brought at that time.

"Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be forever

settled as between the parties." *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 401 (1981) (internal quotations and citation omitted). Thus, "[a] final judgment on the merits of an action precludes parties or their privies from relitigating issues that were or could have been raised in the action." *Id.* at 398. "Court-approved settlements receive the same res judicata effect as litigated judgments." *InteliQuest Media Corp. v. Miller* (*In re InteliQuest Media Corp.*), 326 B.R. 825, 830 (B.A.P. 10th Cir. 2005); *see Johnson v. King*, No. 10-CV-279S, 2011 WL 4963902 *7 (D. Wyo. Oct. 17, 2011) (applying res judicata and collateral estoppel under Wyoming law). Although Ms. Lane was not a party to Plaintiff's Settlement Agreement, the Loan was thoroughly litigated in the Bankruptcy, and Plaintiff could have asserted that the Loan was void or voidable under his prohibited transaction theory at that time. He simply chose not to because it was not in his best interest at the time. The issue cannot be revived here. *See Travelers Indemnity Co. v. Bailey,* 557 U.S 137, 152 (2009) (final bankruptcy court orders that were not challenged on direct review are res judicata).

In the alternative, if this Court does not give credence to the prior ruling in the Bankruptcy Court, we must examine whether the funds transferred were actually retirement assets. Assuming the Loan was executed in June 2010, by that point, if the funds has been retirement funds, they had lost the protections available to retirement funds because Plaintiff had engaged in prohibited transactions, and thus, Plaintiff's argument that the Loan to Ms. Lane was a prohibited transaction by a disqualified person fails because the Internal Revenue Code is no longer applicable. Prohibited transactions include using a retirement account as security for a loan. 26 U.S.C. § 4975(c)(1)(B). In such a case, the retirement funds no longer qualify as a retirement account as of the first day of the taxable year in which the security interest is granted.

26 U.S.C. § 408(e)(2)(A). Pledging an IRA or pension plan as security for a loan is treated as a distribution of the funds. *Lewis v. Bank of America, NA,* 343 F.3d 540, 545 (5th Cir. 2003).

Plaintiff has acknowledged, under oath, that he pledged as security his IRA and Pension Plan, thus causing liens to be filed against his retirement assets. (Ex. 17, pp. 7-8; Ex. 18, ¶¶ 9, 10). This is evidenced by three UCC Financing Statements filed in Wyoming, California, and Michigan in 2009 identifying all of Plaintiff's assets, including retirement funds, as sources of collateral, and further evidenced by his amended California UCC Financing Statement which specifically identified Plaintiff's Pension Plan and IRA. (Ex. 15; Ex. 16). Pursuant to 26 U.S.C. § 408(e)(2)(A), by January 1, 2009, Plaintiff's retirement funds lost their status as protected investments. Any subsequent Loan or transfer of funds is irrelevant and is simply not void or voidable.

For any of the above reasons, summary judgment should be granted on Count VII.

**C. Summary Judgment must be granted on Count VIII of the FAC because Patricia E. Lane did not transfer funds from DFWU, LLC to her bank account, and thus, could not have engaged in a "fraudulent transfer".**

Plaintiff alleges Ms. Lane engaged in a "fraudulent transfer" when $2,029,682.42 was transferred into her personal bank account pursuant to the Loan Agreement. (ECF No. 1-1, ¶¶ 82, 122-126). This claim for relief is the height of hypocrisy. Plaintiff directed and orchestrated the transfer of funds from his IRA and Pension Plan to DFWU and from DFWU to Ms. Lane's personal account, all in effort to first avoid paying child support pursuant to the QDRO, and then to thwart the bankruptcy court from obtaining those funds. (Ex. 21; Ex. 23; Ex. 36).

Both the facts and law demand that summary judgment be granted on this claim for relief. Plaintiff asserts this claim is brought pursuant to the Uniform Fraudulent Transfer Act ("UFTA") as applied through Wyo. Stat. § 34-14-202, which he states is substantially similar to the Arizona

statutes in the FAC. (ECF No. 133, p. 2). The transfers originated in Wyoming at the Bank of Jackson Hole, and thus, Wyoming law is applicable.

It is unclear whether UFTA applies to this situation. Plaintiff appears to argue that he and/or his IRA is a "creditor" and Ms. Lane is a "debtor" since she obtained funds from DFWU, which held Plaintiff's IRA, and to which he claims he is a third-party beneficiary. However, UFTA generally applies to situations involving a "debtor" transferring money or property to avoid his obligations to a creditor, often in a bankruptcy or for tax evasion purposes. *See In re MarMc Transp., Inc.,* No. 10-20653, 2012 WL 5503516, at *9 (Bankr. D. Wyo. Nov. 13, 2012) (allegations did not support fraudulent transfer); *United States v. Wolff,* No. 09-CV-238J, 2010 WL 6238029, at *4 (D. Wyo. May 18, 2010) (transfer of title and/or an interest in property from Defendant Wolff to Restoration Bonding Foundation Trust # 1 where Wolff continued to control and have ownership, use and possession of property was a fraudulent transfer because it was intended to hinder, delay or defraud the United States of America from collecting present and future taxes). UFTA does not appear to apply to a situation like this, which basically involves a Loan between family members.

Even assuming UFTA applies, and assuming Ms. Lane is the "debtor" and Plaintiff is a "creditor", the undisputed facts do not support a finding that Ms. Lane violated UFTA as applied through Wyo. Stat. § 34-14-205 or otherwise engaged in a fraudulent transfer. Ms. Lane did not create the Loan Agreement and has testified Plaintiff created the Loan and provided it to her to sign in 2012 prior to the transfer of funds. This testimony was found credible by the Bankruptcy Court. (Ex. 45, p. 7). However, even if Plaintiff denies this, he cannot deny that he repeatedly, under oath, has testified that he was present at the signing of the Loan and has asserted that the Loan is "valid". (Ex. 29, pp. 84-85; Ex. 31). Thus, his first allegation of a UFTA violation, i.e.,

that the Loan did not provide reasonably equivalent value for the assets, is essentially buyer's remorse and is not actionable. Furthermore, even if Plaintiff could overcome his past assertions that the Loan is valid, and as demonstrated below, that he, in fact, transferred all of the funds, Plaintiff would still have to demonstrate that Ms. Lane intended to incur debts beyond the ability to pay as they became due. Wyo. Stat. § 34-14-205(a)(ii)(B). He cannot demonstrate this, and in fact, as of October 23, 2012, *after* the majority of the transfers occurred, Plaintiff asserted: "The DFWU Operating Agreement permits loans to members and a loan was made to Patricia Lane in full compliance with the Operating Agreement. There is no restriction on DFWU activities as part of the PI stipulation and this loan is perfectly legal. **The loan remains an asset of DFWU and guarantees the unitholders a positive return.**" (Ex. 32) (emphasis added). Plaintiff cannot in good faith argue that at the time the Loan was created and he transferred the funds to Ms. Lane, Ms. Lane intended to incur debts beyond her ability to pay when he asserts the exact opposite – that the Loan is an asset and guarantees a positive return.

Furthermore, the Loan itself is not the issue – it is the transfers made, allegedly pursuant to the Loan, which could constitute a fraudulent transfer under certain circumstances. Those circumstances do not exist here. There is ample evidence to demonstrate that Plaintiff directed the transfer of his retirement funds to DFWU and then from DFWU to Ms. Lane's personal account. Plaintiff directed Brian Jones at the Bank of Jackson Hole to transfer "all securities and all but $250 cash in my IRA account at the Bank of Jackson Hole to the DFWU, LLC account" and directed his brother, Timothy Lane, the supposed trustee of the Pension Plan, to transfer all but $1.00 of its assets to DFWU. (Ex. 21; Ex. 23). On August 23, 2012, Plaintiff began directing the transfer of funds from DFWU to Ms. Lane's personal bank account by sending an email to his brother, Tim Lane, the apparent "manager" of DFWU at that time, thanking him for

advising Plaintiff of the wire transfer of $178,500 from the DFWU account to Patricia Lane's bank account[10]. Plaintiff included Christine Lasher with the Bank of Jackson Hole, who requested additional information about Patricia Lane's bank account, to which Plaintiff responded with the bank account information requested. (Ex. 13). Thus, a series of transactions ensued in which Plaintiff directed the transfer of $2,029,682.42 to Patricia Lane's bank account ($421,000 on August 31, 2012; $106,000 on September 6, 2012; $557,784.95 on October 3, 2012; $369,397.47 on October 10, 2012; $397,000.00 on October 30, 2012). (Ex. 13; Ex. 36; Ex. 47). Plaintiff, as the alleged creditor and self-purported third-party beneficiary to the Loan, is the person who transferred the funds to the "debtor". Thus, Plaintiff has no one to blame but himself[11] if the transfer of funds was made to "hinder, delay or defraud the IRA of Robert M. Lane." (ECF No. 1-1, ¶ 124). Certainly, Ms. Lane, as the "debtor", did not make the transfer with intent to hinder the IRA as she did not participate in the transfer.

Plaintiff's final allegation of a fraudulent transfer involves his claim that the insolvency of the IRA was anticipated by Ms. Lane at the time the Loan was prepared and the funds were received. Again, Ms. Lane asserts she did not prepare the Loan. Irrespective, she did not transfer the funds and did not direct the transfer of the funds. Furthermore, whether insolvency of the IRA was anticipated is irrelevant. Plaintiff appears to be reciting one of the factors of actual intent identified under Wyo. Stat. § 34-14-205(b)(ix), i.e., "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." There is no allegation or argument that Ms. Lane became insolvent; rather, Plaintiff is arguing his IRA, the "creditor", became insolvent, which is immaterial to this claim.

---

[10] Plaintiff's emails state "Patricia Lane" without providing a middle initial. Regardless, the account to which Plaintiff directed the deposit of these funds belonged to both Patricia A. Lane and Patricia E. Lane.
[11] Even if the Court concludes that Timothy Lane was responsible for the transfer of funds, the evidence clearly demonstrates that Ms. Lane did not direct the transfer of funds.

Plaintiff's cause of action against Ms. Lane for fraudulent transfer with intent to harm him and/or his IRA is deplorable given that he is the one who orchestrated the transfers. Equally heinous is that Plaintiff repeatedly asserts to this Court that Ms. Lane fraudulently transferred funds from DFWU to herself while completely omitting the fact that Plaintiff himself directed the transfer. *See* ECF No. 123, pp. 2-4; No. 133, pp. 3-4; No. 137, pp. 5-7. This can be considered nothing less than an attempt to mislead the Court, especially since Plaintiff attaches documents in support of his argument that came from the very same subpoena to the Bank of Jackson Hole on February 14, 2017 in which the documents reflecting the transfers of funds directed by Plaintiff were produced, and thus, Plaintiff continued to make these assertions even after having clear evidence to the contrary. (ECF Nos. 103, 106).

Summary judgment should be granted with respect to Count VIII.

**D. Summary Judgment must be granted on Count IX of the FAC because the Promissory Note between DFWU, LLC and Patricia E. Lane cannot be breached until 2040 and no claim for anticipatory repudiation has arisen.**

The Loan Agreement between DFWU and Ms. Lane is a revolving line of credit for up to five million dollars. (Ex. 28). The amount deposited into Ms. Lane's personal bank account from DFWU is $2,029,682.42 (Ex. 48), but approximately $200,000 of those funds were used for Plaintiff's benefit. (Ex. 11 at 63:15-71:4; Ex. 12). The Loan Agreement has a maturity date of June 23, 2040 with no requirement for early repayment and no basis for accelerating the loan. (Ex. 28). The Loan states: "Borrower (Ms. Lane) is not obligated to make payments on demand to the Lender (DFWU)." (Ex. 28; Ex. 34 at 25:20-26:10). Under the Loan Agreement, Ms. Lane's sole payment obligation is to repay the Loan on or by June 23, 2040. (Ex. 28).

Plaintiff asserts he is a third-party beneficiary of this Loan. (ECF No. 1-1, ¶ 128). It is unclear if this is true. In the past, Plaintiff asserted that he was a manager of DFWU, and as

stated above, Plaintiff directed the transfer of funds from his retirement fund to DFWU and then to Ms. Lane's personal bank account. (Ex. 21; Ex. 23; Ex. 36). Plaintiff's current position appears to be that he has never been a member of DFWU, manager, or otherwise been affiliated with the company in any way. (Ex. 3, Resp. to Interrog. No. 11).

Assuming Plaintiff is a third-party beneficiary and has standing to bring an action for breach of contract, the Loan Agreement clearly states that the Loan is not due until June 23, 2040 and that no prepayment is required even if a request for prepayment is made. (Ex. 28). Thus, the fact that Plaintiff, as "next friend" of DFWU, has demanded early payment is irrelevant. (ECF No. 1-1, ¶ 131). Refusal to make payments prior to the due date does not constitute a breach of contract, or an anticipatory breach of contract, as prepayment is specifically addressed in the Loan Agreement itself. While Plaintiff may complain about the terms of the Loan now, he has previously stated, under oath, that he was present when the Loan Agreement was executed and that the Loan is valid, and furthermore, directed the transfer of funds to Ms. Lane's bank account. (Ex. 29, pp. 84-85; Ex. 31; Ex. 36). Furthermore, Ms. Lane has testified that Plaintiff drafted the Loan Agreement in its entirety. (Ex. 11 at 46:7-10, 51:19-53:10).   At any rate, the Loan Agreement cannot be breached until 2040.

Plaintiff claims Ms. Lane's "communications with [him] to the effect that she will not repay the loan to DFWU, LCC....amounts to anticipatory repudiation of the contract which constitutes a breach of the contract..." (ECF No. 1-1, ¶ 129). Plaintiff offers no details as to where, when, or why this communication took place. The only communication Plaintiff refers to is the demand for early repayment, which is not required, and subsequent refusal to prepay, which is not a breach of contract. (ECF No. 1-1, ¶ 131). Such an unsupported conclusory allegation does not create an issue of fact. *Salehpoor v. Shahinpoor,* 358 F.3d at 789.

Anticipatory repudiation of a contract may give a party an immediate claim against the individual who is refusing to perform the obligations required under the contract. Anticipatory repudiation has been described as follows:

> A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of its obligations under the contract. For a repudiation to have legal effect, the threatened breach must be serious. According to the Restatement Second, it must be serious enough that the injured party could treat it as total if it occurred. A repudiation may be by words or other conduct.
>
> Usually a repudiation consists of a statement that the repudiating party cannot or will not perform. The statement must be sufficiently positive to be reasonably understood as meaning that the breach will actually occur. A party's expressions of doubt as to its willingness or ability to perform do not constitute a repudiation.

*Roussalis v. Wyoming Med. Ctr., Inc.,* 4 P.3d 209, 254 (Wyo. 2000) (quoting E. Allan Farnsworth, Farnsworth on Contracts § 8.20, at 470 (1990)).

No statements have been made nor actions occurred which constitute a repudiation. Contrary to Plaintiff's unsupported assertions that Ms. Lane "will not repay the loan", Ms. Lane has provided testimony related specifically to the Loan and repayment of the Loan, and in fact, was questioned by Plaintiff himself. Ms. Lane testified extensively as to the Loan itself. (*See generally* Ex. 11 at pp. 45-190). When questioned by Plaintiff as to repayment of the Loan, Ms. Lane stated she would not repay the Loan before the maturity date, but did not refuse to pay the Loan. (Ex. 11 at 52:16-53:7; 151:22-23; 190:6-20; Ex. 34 at 43:7-44:6).

Ms. Lane has made no oral statements that she cannot or will not repay the Loan. She has simply refused to pay the Loan prior to its due date. This is neither an anticipatory breach of contract, nor a breach of contract. Summary judgment must be granted on this claim.

### E. The plain language of the Loan Agreement requires Plaintiff to pay Ms. Lane's attorney fees.

The Loan Agreement states if a legal dispute is brought, "[t]he party bringing the dispute shall pay all parties' legal fees." (Ex. 28, p. 3). Plaintiff asserts he is an intended third-party beneficiary of the Loan. (ECF No. 1-1, ¶ 128). Plaintiff has repeatedly testified to the validity of the Loan, asserting that he was present during the signing of the Loan and stating that the Loan was made to Ms. Lane in full compliance with the DFWU Operating Agreement. (Ex. 29, pp. 84-85; Ex. 31; Ex. 32; Ex. 34 at 39:16-40:6). Consequently, Plaintiff is stuck with the terms of the Loan requiring that a party bringing a legal dispute must pay the other party's attorney's fees, *irrespective* of whether the party bringing the suit prevails. Plaintiff should be required to pay all attorney fees associated this lawsuit as it relates to the Loan between DFWU and Ms. Lane even if Ms. Lane does not prevail on this summary judgment motion or at trial.

## VI.    CONCLUSION

All remaining claims against Patricia E. Lane relate to the Loan Agreement between Ms. Lane and DFWU. Plaintiff has previously asserted positions contrary to his current position that the Loan is invalid, and is thus estopped from now arguing that the Loan is void or voidable or did not provide reasonably equivalent value for the assets loaned. Regardless, for the reasons stated above, summary judgment should be granted on all remaining claims against Ms. Lane because in reviewing the record as a whole, a rational trier of fact could not find for Plaintiff, and thus, there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587. Finally, pursuant to the terms of the Loan Agreement, Plaintiff should be required to pay all attorney fees related to defending the action brought against Ms. Lane as it relates to the Loan Agreement with DFWU.

DATED this 3rd day of July, 2017.

Melinda S. McCorkle #6-3905
Stephen H. Kline #5-1761
KLINE, McCORKLE & PILGER
P.O. Box 1938
Cheyenne, WY  82003-1938
Tel:  (307) 778-7056
Fax: (307) 635-8106
*Attorneys for Defendant Patricia E. Lane*

## CERTIFICATE OF SERVICE

I certify the foregoing pleading was served on this 3rd day of July, 2017 and that copies

were served as follows:

Martin Cohn                                  [ X ] ECF/CM
Cohn Rengo                                   [   ] E-Mail
314 East Carrillo Street, Suite 7            [   ] Overnight Delivery
Santa Barbara, CA 93101                      [   ] U.S. Mail
marty@cohnrengo.com
*Pro Hac Vice*


Michael Wilkerson #5-2184                    [ X ] ECF/CM
Wilkerson & Bremer Law Group, LLC            [   ] E-Mail
400 South Kendrick Avenue, Suite 203A        [   ] Overnight Delivery
P.O. Box 607                                 [   ] U.S. Mail
Gillette, WY 82717
michael@rsiwy.com


Judy E. Caldwell